**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Jason Beck, | CV11-0090-TUC-RCC (JR) |
| Petitioner, | |
| vs. | **REPORT AND RECOMMENDATION** |
| Richard Bock, et al., | |
| Respondents. | |

Pending before the Court is Jason Beck's Petition for Writ of Habeas Corpus (Doc. 1) filed pursuant to 28 U.S.C. § 2254. In accordance with the Rules of Practice of the United States District Court for the District of Arizona and 28 U.S.C. § 636(b)(1), this matter was referred to the Magistrate Judge for report and recommendation. As explained below, the Magistrate Judge recommends that the District Court, after an independent review of the record, dismiss the Petition with prejudice.

1

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

2

On February 10, 1998, Beck and his co-defendant, Kevin Craig, were indicted

3

on charges of first degree murder, conspiracy to commit first degree murder, and

4

kidnapping in relation to the killing of David Nickell.   *Answer*, Ex. Q.   Both

5

defendants were tried simultaneously before separate juries and Beck was convicted

6

of first-degree murder (felony murder) and kidnapping.   *Id.*, Ex. A, p. 2.   He was

7

sentenced to natural life in prison on the murder conviction and to a concurrent,

8

aggravated, ten-year prison term for the kidnapping conviction.   *Id*.   The Arizona

9

Court of Appeals summarized the factual background of his convictions as follows:

10

In January 1998, while driving on a dirt road around midnight
near Redington Pass just outside Tucson, a passerby and his passenger

11

found the victim's body by the side of the road and immediately called
police.   Pima County Sheriff's Deputy Molchan testified that he had

12

responded to the call and that, when he had arrived at the scene, he had
noted that the victim's hands had been bound with gray duct tape.   Tire

13

tracks near the body were subsequently determined to be of a similar
tread pattern to the tires that belonged to codefendant Kevin Craig's

14

mother.   The victim had sustained multiple sharp-force wounds in the
neck and trunk areas of his body.   Two neck wounds, one a sliced

15

jugular vein and the other a sliced trachea, had likely caused the
victim's death.

16

17

At the time the victim was murdered, Matthew Kuiper and
Aimee Morris were sharing a Tucson apartment, which, at previous

18

times, they had also shared with [Beck], Craig, and the victim.   The
victim was still living there part-time, but [Beck] and Craig were not.

19

Earlier in the day on which the victim's body was found, [Beck] and
Craig had gone to the apartment, and Craig had asked Kuiper where

20

they could find or how they could contact the victim.   Kuiper had asked
why, and Craig had responded that "they wanted to get him" because

21

the victim had tried to break into [Beck's] car and take his stereo
system.   Kuiper refused to help them find the victim.   [Beck] and Craig

22

then had asked Morris, who gave Craig the victim's pager number.

2

1       That evening, the victim, who was with his girlfriend, received a
2   telephone call from [Beck] and Craig.  The two picked up the victim a
    while later in Craig's mother's car.  The three later returned to the
3   apartment, the victim went back inside for money for gasoline, and the
    three left again.  Close to midnight, [Beck] and Craig retuned to Kuiper
4   and Morris's apartment.  As they walked through the living room to the
    bathroom, Kuiper noticed that Craig was concealing his hands and
5   forearms underneath his shirt and that [Beck] was immediately behind
    him, carrying a backpack.

6       Kuiper followed the two to the bathroom, knocked on the closed
    door, and forced it open when they did not respond.  Craig had tried to
7   keep Kuiper form entering.  Once inside, Kuiper saw that Craig's right
    hand and wrist were covered with blood, that there was blood spattered
8   to his right elbow, and that Craig was washing blood off his hands and
    arm.  He was also washing a knife.  [Beck] was sitting on the toilet,
9   wiping his boots and telling Craig he needed to get the blood off them.
    Kuiper saw the victim's knife on the floor near [Beck's] left foot.
10  Kuiper asked the two what had happened.  Craig first said they had had
    a fight with the victim and had "cut' him.  Craig then looked at [Beck],
11  however, and said, "We killed [the victim]."   During a recorded
    interview by defense counsel, a transcript which was attached to
12  [Beck's] motion in limine, Kuiper related that [Beck] had just laughed
    and smiled; Kuiper characterized the laugh as "an evil snicker."  At
13  trial, Kuiper testified that [Beck] not only laughed and smiled, but had
    nodded his head repeatedly.

14  *Answer*, Ex. A, pp. 4-6.

15
16  Beck appealed his conviction, claiming that the trial court erred when it

17  refused to give his requested jury instruction on second-degree murder, admitted a

18  hearsay statement made by his codefendant, and either denied his motion for

19  judgment of acquittal on the felony-murder charge or failed to dismiss the felony-

20  murder charge on the ground "the offense of kidnapping . . . merged with the

21  murder."  Beck also argued that the jury selection process was flawed, the trial court

22  abused its discretion in imposing a natural life prison term, A.R.S. § 13-703(A) was

3

1  unconstitutional, and that the reasonable doubt instruction given by the court was

2  unconstitutional. *Id*., Ex. A., p. 2; Ex. B (Brief on Appeal).  On September 25, 2001,

3  the Court of Appeals affirmed Beck's conviction in an unpublished memorandum

4  decision. *Id.*, Ex. A.

5       The Arizona Supreme Court granted review and vacated Beck's natural life

6  sentence because the trial court had used the statutory aggravating factors for capital

7  cases. *State v Viramontes (Beck)*, 204 Ariz. 360, 362 (2003).  On remand, the trial

8  court imposed concurrent sentences, the longest of which is life with the possibility

9  of release in 25 years. *Answer*, Ex. C.  Beck did not appeal his sentence.

10       On August 10, 2005, Beck filed a petition for post-conviction relief ("PCR")

11  with the Pima County Superior Court pursuant to Rule 32, Ariz.R.Crim.P., and on

12  November 20, 2006, filed an Amended Petition/Additional Claims.  *Answer*, Exs. D,

13  E.  Beck asserted a claim of prosecutorial misconduct based on numerous alleged

14  violations of disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).

15  He also argued that his trial counsel was ineffective in (1) failing to adequately

16  investigate and confront witnesses Morris, Kuiper and Wimmer; (2) refusing to call

17  another of Beck's cellmates as a witness; (3) failing to adequately litigate the

18  inadmissibility of Kuiper's testimony about Beck's silence; (4) failing to rebut the

19  government's motive evidence and to call character witnesses; (5) failing to urge

20  alternative defenses; and (6) failing to object to "burden-shifting" during the State's

21  closing argument. *Id*., Ex. D, pp. 12-24.  After allowing discovery on Beck's *Brady*

22  claims and conducting a multi-day evidentiary hearing, the trial court, in a ruling

4

1  filed on December 11, 2007, denied each of Beck's claims on the merits. *Id*., Exs. F,

2  G.  On January 25, 2008, the trial court denied Beck's motion for reconsideration.

3  *Id*., Ex. H (unnumbered attachment).

4        On September 17, 2008, Beck filed a petition for review in the Arizona Court

5  of Appeals reasserting his claim of prosecutorial misconduct based on *Brady*

6  violations and also raising six claims that his counsel was ineffective based on his

7  failure to:  (1) adequately investigate and confront witnesses Morris, Kuiper, and

8  Wimmer; (2) offer alternative defenses; (3) rebut the government's motive evidence

9  and to call character witnesses; (4) call another of Beck's cellmates as a witness; (5)

10  adequately litigate the inadmissibility of Kuiper's testimony about Beck's silence;

11  and (6) object to "burden-shifting" during the State's closing argument.  *Id*., Ex. H.

12  In a Memorandum Decision filed on August 28, 2009, the Court of Appeals granted

13  review but adopted the trial court's ruling and denied relief.  *Id*., Ex. I.  The Arizona

14  Court of Appeals denied Beck's motion for reconsideration.  *Id*., Exs. J, K.  Beck

15  then petitioned the Supreme Court for review.  *Id*., Ex. L.  By letter dated March 3,

16  2010, review was denied.  *Id*., Ex. M.

17        In the petition now before the Court, Beck raises eight claims.  In Ground I, he

18  alleges that his conviction was in violation of his rights to a fair trial, due process and

19  *Brady v. Maryland*.   In Ground II, he alleges that his conviction violated his right to

20  due process and *Jackson v. Denno*, 378 U.S. 368 (1964).  In Ground III, he alleges

21  ineffective assistance based on his counsel's failure to adequately investigate and

22  impeach the prosecution's star witnesses.  In Ground IV, he alleges ineffective

5

1   assistance based on his counsel's failure to understand felony murder and present

2   appropriate theories of defense.  Ground V alleges ineffective assistance based on the

3   failure to present witnesses to rebut the State's motive evidence.  In Ground VI, he

4   alleges ineffective assistance based on his counsel's failure to adequately challenge

5   the admission of his adoptive statement and by failing to present evidence of Beck's

6   character trait for reticence.  In Ground VII, Beck alleges that his counsel was

7   ineffective for not objecting to the prosecution's "burden-shifting."  In Ground VIII,

8   he alleges counsel was ineffective for failing to adequately investigate and challenge

9   witness Joshua Wimmer's testimony.   *Petition*, pp. 3-10.

10  **II.     LEGAL DISCUSSION**

11          **A.     The Petition is Timely**

12          The Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA")

13  provides for a one year statute of limitations to file a petition for writ of habeas

14  corpus.  28 U.S.C. § 2244(d)(1).  Petitions filed beyond the one-year limitations

15  period must be dismissed.  *Id.* The statute provides in pertinent part that:

16          (1) A 1–year period of limitation shall apply to an application for a writ
            of habeas corpus by a person in custody pursuant to the judgment of a
17          State court. The limitation period shall run from the latest of-

18          (A) the date on which the judgment became final by the conclusion of
            direct review or the expiration of the time for seeking such review;
19
            (B) the date on which the impediment to filing an application created
20          by State action in violation of the Constitution or laws of the United
            States is removed, if the applicant was prevented from filing by such
21          State action;

22

6

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Under these standards, Beck had one year from March 3, 2010, which was the date on which the Arizona Supreme Court denied review of his PCR petition, to file the instant petition.  As Respondents recognize, the petition was timely filed on February 2, 2011.

## B.    Exhaustion and Procedural Default

Respondents contend that all of Ground II and portions of Grounds VI, VII and VIII were not properly exhausted and are procedurally barred from habeas review.  A state prisoner must exhaust the available state remedies before a federal court may consider the merits of his habeas corpus petition.  *See* 28 U.S.C. § 2254(b)(1)(A); *Nino v. Galaza,* 183 F.3d 1003, 1004 (9th Cir.1999).  "[A] petitioner fairly and fully presents a claim to the state court for purposes of satisfying the exhaustion requirement if he presents the claim: (1) to the proper forum, (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for the

1   claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005) (citations

2   omitted).

3       Exhaustion requires that a habeas petitioner present the substance of his

4   claims to the state courts in order to give them a "fair opportunity to act" upon these

5   claims.  *See O'Sullivan v. Boerckel,* 526 U.S. 838, 844 (1999).  "To exhaust one's

6   state court remedies in Arizona, a petitioner must first raise the claim in a direct

7   appeal or collaterally attack his conviction in a petition for post-conviction relief

8   pursuant to Rule 32," *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994), and then

9   present his claims to the Arizona Court of Appeals.  *See Swoopes v. Sublett,* 196 F.3d

10  1008, 1010 (9th Cir. 1999).

11      Additionally, a state prisoner must not only present the claims to the proper

12  court, but must also present them fairly.  A claim has been "fairly presented" if the

13  petitioner has described the operative facts and federal legal theories on which the

14  claim is based.  *Picard v. Connor*, 404 U.S. 270, 277-78 (1971); *Rice v. Wood*, 44

15  F.3d 1396, 1403 (9th Cir. 1995).  "Our rule is that a state prisoner has not 'fairly

16  presented' (and thus exhausted) his federal claims in state court unless he specifically

17  indicated to that court that those claims were based on federal law."  *Lyons v.*

18  *Crawford*, 232 F.3d 666, 668 (9th Cir. 2000), amended on other grounds, 247 F.3d

19  904 (9th Cir. 2001).  A petitioner must alert the state court to the specific federal

20  constitutional guaranty upon which his claims are based, *Tamalini v. Stewart*, 249

21  F.3d 895, 898 (9th Cir. 2001), however, general appeals in state court to broad

22  constitutional principles, such as due process, equal protection, and the right to a fair

8

trial, are insufficient to establish fair presentation of a federal constitutional claim. *Lyons*, 232 F.3d at 669. Moreover, it is not enough that a petitioner presented to the state court all the facts necessary to support an inadequately identified federal claim or that a "somewhat similar" state law claim was raised. *Baldwin v. Reese*, 541 U.S. 27, 28 (2004); *Shumway v. Payne*, 223 F.3d 982, 988 (9th Cir. 2000) (mere similarity between a claim of state and federal error insufficient to establish exhaustion). "Exhaustion demands more than drive-by citation, detached from any articulation of an underlying federal legal theory." *Castillo v. McFadden*, 399 F.3d 993, 1003 (9th Cir. 2005).

Claims may be procedurally defaulted and barred from federal habeas review in a variety of circumstances. If a state court expressly applied an adequate and independent state procedural bar when the petitioner attempted to raise the claim in state court review of the merits of the claim by a federal habeas court is barred. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). Arizona courts have been consistent in the application of the state's procedural default rules. *Stewart v. Smith*, 536 U.S. 856, 860 (2002) (holding that Ariz.R.Cirm.P. 32.2(a) is an adequate and independent procedural bar). In Arizona, claims not previously presented to the state courts on either direct appeal or collateral review are generally barred from federal review because any attempt to return to state court to present them would be futile unless the claims fit into a narrow range of exceptions. *See Ariz.R.Crim.P.* 32.1(d)-(h), 32.2(a) (precluding claims not raised on direct appeal or in prior post-conviction relief petitions), 32.4(a) (time bar), 32.9(c) (petition for review must be filed within thirty

days of trial court's decision). Because these rules have been found to be consistently and regularly followed, and because they are independent of federal law, either their specific application to a claim by an Arizona court, or their operation to preclude a return to state court to exhaust a claim, will procedurally bar subsequent review of the merits of such a claim by a federal habeas court. *Stewart*, 536 U.S. at 860; *Ortiz v. Stewart*, 149 F.3d 923, 931-32 (9th Cir. 1998) (Rule 32, Ariz.R.Crim.P. is strictly followed); *State v. Mata*, 916 P.2d 1035, 1050-52 (Ariz. 1996) (waiver and preclusion rules strictly applied in postconviction proceedings).

A federal court may not consider the merits of a procedurally defaulted claim unless the petitioner can demonstrate cause for his noncompliance and actual prejudice, or establish that a miscarriage of justice would result from the lack of review. *See Schlup v. Delo*, 513 U.S. 298, 321 (1995). To establish cause, a petitioner must point to some objective factor external to the defense impeded his efforts to comply with the state's procedural rules. *Dretke v. Haley*, 541 U.S. 386, 393-94 (2004). "[C]ause is an external impediment such as government interference or reasonable unavailability of a claims factual basis." *Robinson v. Ignacio*, 360 F.3d 1044, 1052 (9th Cir. 2004) (citations omitted). Ignorance of the state's procedural rules or lack of legal training do not constitute legally cognizable "cause" for a petitioner's failure to fairly present a claim. *Hughes v. Idaho State Board of Corrections*, 800 F.2d 905, 908-10 (9th Cir. 1986); *Schneider v. McDaniel*, 674 F.3d 1144, 1153 (9th Cir. 2012). "Prejudice" is actual harm resulting from the

1   constitutional violation or error.  *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir.

2   1984); *Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir. 1996).

3        Alternatively, a federal court may review the merits of a procedurally

4   defaulted claim where a petitioner can establish that a "fundamental miscarriage of

5   justice" would otherwise result.  *Schlup v. Delo*, 513 U.S. at 327.  A fundamental

6   miscarriage of justice exists when a constitutional violation resulted in the conviction

7   of one who is actually innocent.  *Id*.

8                     **1.   Analysis of Claims**

9                     **a.   Grounds II and VII**

10        In Ground II, Beck alleges that his conviction violated his right to due process

11   and *Jackson v. Denno*, 378 U.S. 368 (1964).  *Petition*, p. 4.  The basis of the claim, as

12   explained in Beck's reply and in his PCR petition, is the prosecution's alleged *Brady*

13   violations and the trial court's refusal to allow him to undertake discovery on these

14   claims.  *Reply*, pp. 18-22; *Answer*, Ex. H, pp. 13-16.  In Beck's PCR proceedings, the

15   Arizona Court of Appeals found that, to the extent Beck alleges prosecutorial

16   misconduct at trial, based on Ariz.R.Crim.P. 32.2(a)(3), "his claims are waived and

17   precluded by his failure to have raised them at trial and on appeal."  *Answer*, Ex. I, p.

18   6 n. 4.   Rule 32.2(a)(3) constitutes an independent and adequate state ground

19   justifying a procedural default.  *See Stewart v. Smith*, 536 U.S. 856, 860 (2002).

20   Beck offers nothing in his reply to rebut the Respondents' position and, as such,

21   Ground II is procedurally defaulted.

22

1      The same analysis applies to a portion of Ground VII.  In that claim, Beck

2  asserts that his Fifth Amendment right to due process and Sixth Amendment right to

3  a fair trial were violated because his "statement was obtained in violation of burden-

4  shifting and vouching and trial counsel committed *Strickland* error by failing to

5  object to the prosecution's burden-shifting."  *Petition*, p. 9.  In his PCR petition,

6  Beck raised this claim as one of prosecutorial misconduct and ineffective assistance

7  of counsel.  *Answer*, Ex. H, p. 29.  As it did with Ground II, the Arizona Court of

8  Appeals found the claim of prosecutorial misconduct precluded by Rule 32.2(a)(3).

9  *Answer*, Ex. I, p. 6 n. 4.  As such, the claim of ineffective assistance of counsel is

10  exhausted, but the claim of prosecutorial misconduct was not.

11              **b.      Ground VI**

12      Respondents also contend that a portion of Ground VI is procedurally

13  defaulted.   In that claim, Beck alleges that his codefendant's statement was

14  inadmissible hearsay and was not properly admitted into evidence as an adopted

15  admission by Beck.   He asserts that its admission resulted from his counsel's

16  ineffective assistance and violated the confrontation clause and *Bruton v. United*

17  *States*, 391 U.S. 123 (1968).  On appeal, the Arizona Court of Appeals found that

18  Beck:

19          contends for the first time that admission of the statement violated
20          *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476
          (1968), and the Confrontation Clause of the Sixth Amendment.  As the
          state correctly points out, not only did [Beck] waive this claim by
21          failing to present it squarely to the trial court, *see State v. Calabrese*,
          157 Ariz. 189, 755 P.2d 1177 (App. 1988), but *Bruton* does not apply
22          here.

*Answer*, Ex. A, p. 8.

In *State v. Calabrese*, 157 Ariz. 189 (App. 1988) and the case upon which it relies, *State v. Tison*, 129 Ariz. 526 (1981), the Arizona courts determined that issues not timely raised in the trial court are waived on appeal. *See* Rule 16.1(c), Ariz.R.Crim.P. Thus, as Respondents contend, the decision of the Arizona Court of Appeals rests on a state law ground that is independent of the federal questions and adequate to support it. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). However, as Respondents also recognize, Beck did raise this claim as a claim of ineffective assistance of counsel and, therefore, that part of the claim is exhausted. *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999).

### c.    Ground VIII

Ground VIII of the Petition addresses the testimony of Joshua Wimmer. At trial, Wimmer testified that he was in jail with Beck and that, while they were there, they spoke to each other daily, often through the vent that ran between their cells. *Answer*, Ex. V, pp. 14-15, 18. Wimmer testified that during one of their conversations through the vent, Beck said:

> that him and another male tricked this guy into going up to Reddington Pass with them. And he said that it was obvious that he had to have help from his friend to tie him up because one person couldn't tie him up. But he at that time admitted that he was the one that stabbed him several times.

*Id.*, Ex. V, p. 25.

1     In the Petition, Beck alleges that his trial counsel "failed to adequately

2 investigate and challenge Wimmer's credibility by confronting Wimmer about his

3 clear motive to lie and by failing to call a defense witness who would have rebutted

4 the substance of Wimmer's testimony." *Petition*, p. 10.  Respondents contend that

5 Beck did not allege in his PCR proceeding that his counsel failed to confront

6 Wimmer about his motive to lie and, therefore, that portion of the claim is not

7 exhausted. *Answer*, p. 14.  While new bases for ineffective assistance of counsel

8 claims that were not raised in the state proceedings are not exhausted, *Moormann v.*

9 *Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005), the distinction between the claim Beck

10 raised in his PCR petition and the claim he raises here is a bit too fine to support a

11 finding that the claim is not exhausted.  The PCR petition can be fairly read to claim

12 ineffective assistance in relation to the entirety of the cross-examination of Wimmer

13 by Beck's counsel.  Thus, this claim should be considered exhausted and be reviewed

14 on its merits.

15                    **2.        Cause and Prejudice**

16     Respondents contend and Beck does not contradict, that Beck is procedurally

17 barred from now raising Ground II and the unexhausted portions of Grounds VI  and

18 VII in State court.  *See* Ariz.R.Crim.P. 32.2(a)(3) ("A defendant shall be precluded

19 from relief under [Rule 32] based upon any ground . . . [t]hat has been waived at trial,

20 on appeal, or in any previous collateral proceeding.")  *Beaty v. Stewart*, 303 F.3d

21 975, 987 (9th Cir. 2002).  As such, the merits of the claims need not be addressed

22 unless Beck establishes cause and prejudice or that a fundamental miscarriage of

1  justice has occurred.  In his reply, Beck does not argue that cause and prejudice exist

2  in this case and, therefore, the claims are not subject to review.

3      **C.    Merits**

4          Under the AEDPA, a federal court "shall not" grant habeas relief with respect

5  to "any claim that was adjudicated on the merits in State court proceedings" unless

6  the state decision was (1) contrary to, or an unreasonable application of, clearly

7  established federal law as determined by the United States Supreme Court; or (2)

8  based on an unreasonable determination of the facts in light of the evidence presented

9  in the State court proceeding.  28 U.S.C. § 2254(d).  *See Williams v. Taylor*, 120

10  S.Ct. 1495 (2000).  A state court's decision can be "contrary to" federal law either (1)

11  if it fails to apply the correct controlling authority, or (2) if it applies the controlling

12  authority to a case involving facts "materially indistinguishable" from those in a

13  controlling case, but nonetheless reaches a different result.  *Van Tran v. Lindsey*, 212

14  F.3d 1143, 1150 (9th Cir. 2000).  In determining whether a state court decision is

15  contrary to federal law, the court must examine the last reasoned decision of a state

16  court and the basis of the state court's judgment.  *Packer v. Hill*, 277 F.3d 1092, 1101

17  (9th Cir. 2002).  A state court's decision can be an unreasonable application of federal

18  law either (1) if it correctly identifies the governing legal principle but applies it to a

19  new set of facts in a way that is objectively unreasonable, or (2) if it extends or fails

20  to extend a clearly established legal principle to a new context in a way that is

21  objectively unreasonable.  *Hernandez v. Small*, 282 F.3d 1132 (9th Cir. 2002).

22

**1.      Grounds I and III**

In Ground I, Beck alleges that his conviction was in violation of his rights to a fair trial, due process and *Brady v. Maryland*, 373 U.S. 83 (1963), because the prosecutor failed to disclose impeachment evidence relevant to the testimony of Kuiper and Morris.   In Ground III, he alleges ineffective assistance based on his counsel's failure to adequately investigate Kuiper and Morris' backgrounds so they could be effectively impeached.   Under both theories, Beck's contention is that the testimony of Kuiper and Morris led to his conviction and he alleges that *Brady* material relevant to these witnesses went undisclosed.   *Reply*, p. 14.   According to Beck, the prosecution "never explained how the wealth of impeaching evidence available in Morris' juvenile records was never disclosed."   This evidence includes "juvenile convictions, probation status, drug use, [and] false denial of drug use during her defense interview . . . ."   *Id.*

Addressing Beck's *Brady/Strickland* claims, the trial court found no prejudice resulted.   *Answer*, Ex. G.   The trial court first noted that after "extensive discovery" and "ample court time," Beck had failed to establish his theories of prosecutorial misconduct.   *Id.*, p. 1.   The court also noted that although the evidentiary hearing was directed at Beck's *Strickland* claims, he was nevertheless permitted to examine the witnesses about his *Brady* claims.   *Id.*   Addressing the latter claims, the court stated:

> [Beck's] Rule 32 counsel argues that [Beck's trial counsel] Mr. Bock's cross examination of key witnesses was so ineffective that [Beck's] right to effective trial counsel was unsatisfied.   At the evidentiary hearing counsel for [Beck] had the opportunity to demonstrate the results of the cross examination he advocates.   Ami

16

1

2

> Morris testified and denied any special treatment by the county attorney's office or ill feeling towards [Beck].   Matt Kuiper was located, testified and did confirm that he believed pending charges were resolved because of his status as a state's witness.  This was the only significant point supporting [Beck's] position.

3

4    *Answer*, Ex. G, p. 2.  After discussing the potential testimony of another potential

5    witness, the trial court concluded that "[t]he record here is not the rare one where

6    additional impeachment would probably have changed the jury's verdict."  *Id.*, p. 3.

7         In adopting the trial court's resolution of this claim, the Court of Appeals

8    stated:

9

10

11

> On review, Beck essentially restates the claims he raised below. He contends the trial court erred in relying on evidence other than the testimony of Aimee [Morris], Matt [Kuiper], and Joshua [Wimmer] in concluding that Beck had not been prejudiced by either the alleged *Brady* violations or the alleged ineffective assistance of counsel.

12

13

14

15

16

17

18

> To determine whether a conviction must be reversed because either *Brady* violations or incompetent performance by counsel prejudiced the defense, the inquiry is the same: whether there is a reasonable probability that, but for the alleged violations or errors, the result of the proceeding would have been different.  *See State v. Bennett*, 213 Ariz. 562, [568], 146 P.3d 63, 69 (2006) (establishing prejudice for claim of ineffective assistance of counsel requires demonstration of "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different'"), *quoting Strickland*, 466 U.S. at 694; *State v. Spears*, 184 Ariz. 277, 287, 908 P.2d 1062, 1072 (1996)   ("[Exculpatory e]vidence is material only if there is a reasonable probability that disclosure of the evidence to the defense would have changed the outcome of the proceeding.").  The court's findings are consistent with this required analysis.

19

20    *Answer*, Ex. I, pp. 7-8 (footnotes omitted).

21         The state courts' resolution of this claim was neither contrary to, or an

22    unreasonable application of, clearly established federal law, nor based on an

1    unreasonable determination of the facts in light of the evidence presented in the State

2    court proceeding.   28 U.S.C. § 2254(d).   Assuming the impeachment evidence at

3    issue was not disclosed by the prosecutor in violation of *Brady*, or was not

4    discovered by his own counsel in violation of *Strickland*, Beck was required, as the

5    state courts found, to establish prejudice.   To establish a *Brady* violation, "[t]he

6    evidence at issue must be favorable to the accused, either because it is exculpatory, or

7    because it is impeaching; the evidence must have been suppressed by the State, either

8    willfully or inadvertently; and prejudice must have ensued."   *Strickler v. Greene*, 527

9    U.S. at 281-82; *Maxwell v. Roe*, 628 F.3d 486, 509 (9th Cri. 2010).   To establish

10   prejudice under *Brady*, a petitioner must show a reasonable probability that, had the

11   evidence been disclosed to the defense, the result of the proceeding would have been

12   different.   *Hamilton v. Ayers*, 583 F.3d 1100, 1110 (9th Cir. 2009).

13          Similarly, under *Strickland*, a petitioner must prove that his counsel's

14   representation fell below an objective standard of reasonableness and that he suffered

15   prejudice.   *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   Establishing

16   prejudice requires a petitioner to demonstrate that a reasonable probability exists that,

17   but for counsel's error, the result would have been different.   466 U.S. at 694.   The

18   court is not required to determine whether counsel's performance was deficient

19   before determining whether petitioner suffered prejudice as a result of the alleged

20   deficiencies.   466 U.S. at 697 ("if it is easier to dispose of an ineffectiveness claim on

21   the ground of lack of sufficient prejudice . . . that course should be followed.").   A

22

1  review of the trial evidence fully supports a finding that the state court reasonably

2  concluded that Beck was not prejudiced under these standards.

3        Aimee Morris testified that she and Matthew Kuiper were living together and

4  that Beck, Craig, and the victim, David Nickell, had also previously lived with them

5  in their apartment. *Answer*, Ex. V, pp. 140, 142.  Morris and Kuiper both recalled

6  that Beck and Craig had come to the apartment in the afternoon of January 26, 1998.

7  *Id*., Ex. V, pp. 145, 147-148; Ex. W, p. 67.  Kuiper was in the bedroom at the time

8  and both Craig and Beck went into the bedroom and Craig asked Kuiper if he knew

9  where Nickell was or how he could contact him.  *Id*., Ex. W, p. 68.  Kuiper asked

10  Craig why he was looking for Nickell, and Craig said "because he wanted to get

11  him," and both Craig and Beck claimed that Nickell tried to break into Beck's car

12  and steal a stereo system.  *Id.*, pp. 70-71.  After Kuiper told them he would not give

13  them Nickell's pager number, they both stormed out of the room and went to speak

14  to Morris.  *Id*., pp. 71-72. Morris gave them the pager number and Craig and Beck

15  then left the apartment.  *Id*., Ex. V, pp. 148-149.

16        Tiffany Spivey, Nickell's girlfriend, testified that Nickell, who was staying

17  with Spivey, got a phone call at about 7:00 p.m. that evening.  *Answer*, Ex. V, p. 110.

18  Nickell got dressed.  *Id*., p. 111.  Beck and Craig then arrived at the apartment and

19  Nickell left with them in a maroon colored vehicle.  *Id.*, Ex. V, p. 111.  Spivey had

20  seen the car previously and knew it belonged to Craig's mother, Krystal.  *Id*., p. 114.

21  After getting a call from the victim at about 9:00 p.m., Spivey recalled that the three

22

1    returned to her apartment to get money for gas.  *Id*., p. 115-116.  Spivey did not see

2    or talk to the victim again after he left with Beck and Craig.  *Id*., p. 116.

3        Morris and Kuiper next saw Craig and Beck sometime before midnight that

4    night when they returned to Morris and Kuiper's apartment.  *Id*., Ex. V, p. 149; Ex.

5    W, pp. 72-73.  Craig entered the apartment first, with his hands underneath his shirt,

6    followed closely by Beck, who was carrying a backpack.  *Id*., Ex. V, p. 151; Ex. W,

7    p. 73.  Both of them rushed to the master bathroom and closed themselves inside the

8    bathroom.  *Id*., Ex. V, pp. 151-152, 179; Ex. W. pp. 73-74.  Kuiper followed them

9    back to the bathroom to find out what was going on, but the door was shut and there

10   was no response to his knock on the door.  *Id*., Ex. W, p. 76.  He then tried to force

11   his way into the bathroom and, after overcoming Craig's resistance, forced his way

12   into the bathroom.  *Id*., Ex. W, p. 77.  Morris also followed, but when she reached the

13   bathroom, they had already slammed the door preventing her from entering.  *Id*., Ex.

14   V, p. 153.  At that time, she heard Beck "say something about getting rid of some

15   clothes."  *Id*., Ex. V, p. 154.

16       Kuiper, who was then inside the bathroom with Beck and Craig, saw that

17   Craig was washing blood from his right hand and arm and from a knife.  *Id*., Ex. W,

18   p. 78. Beck was sitting on the toilet seat telling Craig he needed to get the blood off

19   his boots.  *Id*., Ex. W, pp. 79, 128.  Kuiper also saw a knife, which Kuiper recognized

20   as belonging to Nickell, on the floor next to Beck.  *Id*., Ex. W, p. 80.  Kuiper asked

21   the two what they had done and Craig initially told him that they had found Nickell

22   at a Wal-Mart, got into a fight with him, and cut him.  Craig said Nickell then got

into a car "and took off with some friends." *Id.*, Ex. W, pp. 81-82.  Believing that there was too much blood for a "cut and run," Kuiper kept asking what they had done.  Eventually, Craig said to Beck, "We killed [Nickell]."  *Id.*, Ex. W, pp. 82, 114-115.  Beck responded by laughing, smiling and repeatedly nodding his head.  *Id.*

After five or ten minutes, Morris had another man who was at the apartment bust the door down to get Kuiper out and to find out exactly what was going on. *Id.*, Ex. V, p. 155.  As the door opened, Craig slammed it closed again.  *Id.*, Ex. V, pp. 155-156.  However, while the door was open, Morris saw Craig washing blood off his hands in the sink with Beck sitting on the toilet seat.  *Id.*, Ex. V, p. 156-157. After a few more minutes, Kuiper told the two to leave and Beck and Craig together left the apartment.  *Id.*, Ex. V, p. 157; Ex. W, p. 84.

At trial, Criminologist Ronald Bridgemon testified that tire impressions found in Redington Pass near the victim's body were similar in size and tread design to those on the car Beck was known to be driving the night of the murder.  *Answer*, Ex. V, p. 97.  Officer James Gamber transported Beck to jail the night he was arrested and Beck asked Gamber "as to what would happen to a person in a hypothetical situation who wanted someone to be beaten up and the second party of the assault killed the person who was scared." *Answer*, Ex. V, 136-137.

During the hearing on Beck's PCR claims, Morris repeatedly denied receiving any special treatment from the prosecution. *Answer*, Exs. FF, pp. 46-68; GG, pp. 21-23, 36-40.  She admitted using marijuana and methamphetamine from July 1997 until the time of the murder in January 1998, but said she was not a daily user.  *Id.*, Ex. FF,

pp. 35-36, 39.  At the time of Beck's trial, Morris was on juvenile probation for passing a bad check.  *Id*., Ex. FF, pp. 32-33, 46-48, 56-58, 61; Ex. JJ, pp. 43-44, 92-93.  As for Kuiper, he testified that he thought a misdemeanor auto theft charge against him "was resolved" by a no contest plea because he had agreed to testify, but clarified that he assumed the plea was related but that no guarantees were made and that "no one offered [him] anything."  *Id*., Ex. G, p. 2; Ex. JJ, pp. 39, 112, 128-133.  Kuiper also admitted to heavy methamphetamine and cocaine use in the months before the murder.  *Id*., Ex. JJ, pp. 45-48.  He also indicated that the prosecutor had talked to him about "witness protection," *id*., Ex. JJ, p. 62, but that nothing was ever promised.  *Id*., Ex. JJ, p. 112.

Considering this potential impeachment evidence against the background of the testimony elicited at trial, it was not unreasonable for the state courts to find that Beck was not prejudiced by either the prosecutor's alleged *Brady* violation or his counsel's alleged ineffectiveness in cross-examining Morris and Kuiper.  The strongest impeachment evidence that went unused was Kuiper's drug use, and that evidence is not as strong as Beck suggests it is.  At the Rule 32 hearing, Kuiper admitted to drug use, but indicated that he had begun to try to go straight beginning about a month before Nickell's murder.  *Answer*, Ex. JJ, p. 47.  More important, Kuiper's story was fully consistent with that offered by Morris and Spivey.  And, as the trial court determined, the jury's guilty verdict on the kidnapping and felony murder counts was entirely consistent with the statement Beck made to Officer Gamber while he was being transported.  The verdicts were also supported by

1    Criminologist Bridgemon's determination that tread patterns left at the scene were

2    consistent with those of the tires on the Honda Civic Beck and Craig were known to

3    be driving.  Finally, there was also the testimony from Joshua Wimmer that Beck,

4    while in jail, admitted to his participation in tying up and stabbing Nickell.  With this

5    mountain of evidence working against him, this Court cannot conclude, as Beck

6    contends, that the state courts reached an unreasonable conclusion in finding that the

7    impeachment evidence he cites would not have changed the result of his trial.

8    *Hamilton*, 583 F.3d at 1110 (to establish prejudice under *Brady*, a petitioner must

9    show a reasonable probability that, had the evidence been disclosed to the defense,

10   the result of the proceeding would have been different); *Strickland*, 466 U.S. at 694

11   (to establish prejudice a petitioner to demonstrate that a reasonable probability exists

12   that, but for counsel's error, the result would have been different).  As such, Grounds

13   I and III do not merit relief.

14              **2.      Remaining Ineffective Assistance of Counsel Claims**

15              The remaining claims, which are comprised of Grounds IV, V, VIII and the

16   exhausted portions of Grounds VI and VII, are all based on ineffective assistance of

17   counsel.  The operative legal standard applicable to the these remaining claims is a

18   familiar one, addressed by the United States Supreme Court in *Strickland v.*

19   *Washington*, 466 U.S. 668 (1984).  The standards enunciated there by the Court are

20   applied unless there is other Supreme Court precedent directly on point.  *See Wright*

21   *v. Van Patten*, 128 S.Ct. 743, 746 (2008).  Under *Strickland*, Beck must show both

22   deficient performance and prejudice in order to establish that counsel's representation

23

1   was ineffective.   466 U.S. at 687.   Deficient performance is established by a

2   petitioner's showing that counsel's performance fell below an objective standard of

3   reasonableness.  *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000) (citing *Strickland*,

4   466 U.S. at 687).   To establish prejudice, the petitioner must show that there is a

5   reasonable probability that, but for counsel's unprofessional errors, the result of the

6   proceeding would have been different.  *Id*.   The review of counsel's performance

7   must be "highly deferential" and must adopt counsel's perspective at the time of the

8   challenged decision or conduct, in order to avoid the distorting effects of hindsight.

9   *Strickland*, 466 U.S. at 689.

10        Federal habeas rules also instruct that, if the state court has already rejected a

11   claim of ineffective assistance of counsel, a federal habeas court may grant relief

12   only if it finds the state court's decision was contrary to, or an unreasonable

13   application of the *Strickland* standards.   *See Yarborough v. Gentry*, 540 U.S. 1, 5

14   (2003).   There is a strong presumption that counsel's conduct falls within the wide

15   range of reasonable assistance, *id.,* and the Supreme Court had described federal

16   review of a state court's decision on a claim of ineffective assistance of counsel as

17   "doubly deferential."  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1403 (2011) (quoting

18   *Knowles v. Mirzayance*, 556 U.S. 111, 112-113 (2009).

19                                    a.       Ground IV

20        In Ground IV, Beck alleges ineffective assistance based on his counsel's

21   failure to understand felony murder and present appropriate theories of defense.

22   Specifically, he contends that the defense presented, that he was not present when

24

Craig bound and killed Nickell, was not viable and that counsel should have argued

in the alternative that, if Beck was present, he was only guilty of unlawful restraint

and that the kidnapping was completed prior to Craig unexpectedly killing Nickell.

*Reply*, p. 28.

Addressing this claim in Beck's Rule 32 proceedings, the trial court found

that:

> failing to argue in the alternative that petitioner was only guilty of
> unlawful imprisonment was not ineffective.  This argument might look
> plausible in a Rule 32 petition but it has little likelihood of success
> before a jury.

*Answer*, Ex. G, p. 4.  The trial court then concluded that Beck had not established

that his counsel was ineffective or that he had been prejudiced by the defense strategy

or tactics.  *Id*.  The court of appeals adopted the trial court's analysis.  *Id*., Ex. I.

During the hearings on his Rule 32 petition, Beck's counsel was asked if he

ever contemplated the defense Beck now urges, and explained to Beck's Rule 32

counsel:

> Well, we talked about this, and your theory for a backup argument was
> that I should have asked for a lesser-included of false imprisonment,
> and the theory I did not feel was a good theory, as I discussed that with
> you.  The way this person was duct taped, it certainly looked like he
> was moved without his consent, and I didn't feel that was a good theory
> to be trying to get him a lesser-included of false imprisonment.

> *            *            *

> And, you know, looking back at it, I still don't think I made the wrong
> call even though Jason [Beck] has, you know, been convicted, I still
> don't think I made the wrong call on this unlawful imprisonment.

25

1

2

        If you had tried the case, you might have the ability to argue it well, if he was present, he was – he only unlawfully imprisoned [Mr. Nickell], but sometimes inconsistent argument are very difficult to make.

3

4

                    \*       \*       \*

5

. . . there was no physical evidence to suggest that Jason [Beck] was even at the scene in terms of the State's case in chief and their rebuttal, there was nothing to suggest that he was at the scene.

6

*Answer*, Ex. Z, pp. 101-105.

7

8

       Once counsel reasonably selects a defense, it is not deficient performance to

9

fail to pursue alternative defenses.  *Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998);

10

*Turk v. White*, 116 F.3d 1264, 1267 (9th Cir. 1997).   Here, defense counsel elected to

11

present a defense consistent with the physical evidence which did not put Beck at the

12

scene of the murder.   The question is whether under the "doubly deferential"

13

standards of the AEDPA the state courts' finding that the decision to adopt that

14

defense was not ineffective or prejudicial under *Strickland* was unreasonable.

15

       Addressing first the effectiveness prong, this court cannot say counsel's

16

selection of a defense or the state courts' finding on that point was unreasonable.

17

Given the evidence presented at trial, there is no reason to believe that the defense

18

Beck now urges could be considered a better choice even when viewed in hindsight.

19

As set-out in more detail above, the testimonial and circumstantial evidence

20

presented at trial set-out a pretty clear impression of Beck's extensive role in

21

Nickell's murder.  First, both Morris and Kuiper testified that Beck, by grinning and

22

nodding, adopted Craig's statement that "we killed Nickell."  Second, Beck as much

1   as admitted he was present during the murder when he asked Officer Gamber "what

2   would happen to a person in a hypothetical situation who wanted someone to be

3   beaten up and the second party of the assault killed the person who was scared."

4   *Answer*, Ex. V, 136-137.   Third, Beck's prison-mate, Wimmer, testified that Beck

5   had admitted to binding Nickell and stabbing him.   Fourth, all of the circumstantial

6   evidence suggested that Beck and Craig remained together throughout the afternoon

7   and evening.   They first went to Kuiper's apartment looking for Nickell, they were

8   then seen twice by Nickell's girlfriend, first when they picked Nickell up and again

9   when they returned for gas money, and then lastly when they again showed up at

10   Kuiper's apartment just before midnight.

11          Faced with these facts, Beck's trial counsel was required to decide whether he

12   would argue Beck was not there; Beck was there, but was guilty only of unlawful

13   imprisonment; or offer both possibilities and let the jury decide.   None of these

14   options are particularly attractive, but it was reasonable for counsel to choose the

15   course he adopted for the defense.   There was no physical evidence from the scene of

16   the murder that conclusively established Beck was there.   That factual situation

17   enabled counsel to urge the jury to find that Beck had no role in the murder.

18          On the other hand, although Beck posits an alternative defense, he does not

19   even attempt to explain how the evidence might support his assertion that a better

20   defense would have been to argue he was guilty of only unlawful restraint or that 'the

21   kidnapping was completed prior to the co-defendant unexpectedly killing the

22   decedent."   *Reply*, p. 28.   As Beck himself notes, the prosecution "sneered at the

27

1   thought that [Craig] left [Beck], killed the decedent, retrieved [Beck], and then

2   returned to Kuiper's apartment to wash off the blood was 'hogwash.   That is

3   absolutely false.'"   *Reply*, p. 28 (citing *Answer*, Ex. X, pp. 32-39, 79-80, 82-83).

4   What Beck fails to explain is how the alternative argument, that Beck was with Craig

5   the entire time, would support the notion that he was guilty only of unlawful restraint

6   or that the "kidnapping was completed" before Craig killed Nickell.  Beck apparently

7   believes it would have been a better approach to admit he was present during the

8   course of the evening, but nevertheless expect the jury to somehow find him less

9   culpable despite the statements he made to Officer Gamber and to prison-mate

10  Wimmer.   His argument is not compelling and supports neither the idea that his

11  counsel's selection of a defense was unreasonable, nor the assertion that the state

12  courts' decision on this claim was unreasonable.

13      The answer to that query determines not only whether Beck's counsel was

14  ineffective for choosing the defense presented at trial, but also determines if Beck

15  suffered any prejudice.  Simply put, if the defense chosen would have changed the

16  outcome, Beck's counsel was ineffective and prejudice resulted.   Given the

17  deferential standards of the AEDPA, this Court is unable to say that it was

18  unreasonable for the state courts to find Beck was not prejudiced.  As mentioned

19  above, the testimonial and circumstantial evidence presented at trial set-out a pretty

20  clear impression of Beck's role in Nickell's murder.

21      Moreover, presenting an alternative defense that admitted to Beck's presence

22  at the scene would have diluted the strength of the chosen defense because the

28

1   theories are mutually exclusive.   As Beck's trial counsel and the trial court

2   recognized, presenting alternative theories often results in neither theory being

3   believed by the jury.   Had the alternative theory been presented in this case, the

4   defense based on the lack of physical evidence would certainly have been rejected

5   out of hand.   Counsel made a reasonable decision in choosing to attack the State's

6   case based on the lack of physical evidence.   *See Turk v. White*, 116 F.3d 1264,

7   1266–67 (9th Cir. 1997) (concluding that once counsel reasonably selects a defense,

8   failing to present an alternative and inconsistent defense is not ineffective assistance

9   of counsel).

10        As for prejudice, as the preceding discussion suggests, it is unlikely that any

11   potential defense other than that chosen by counsel would have changed the outcome

12   of his trial.   *Strickland*, 466 U.S. at 694.   Beck has simply not shown how his

13   proposed defensive changes are supported by the evidence or how they would have

14   swayed the jury.

15                    **b.     Ground V**

16        Ground V alleges ineffective assistance based on the failure to present

17   witnesses to rebut the State's motive theory that Nickell was targeted because he had

18   tried to steal Beck's car stereo.   Respondents argue that "the record provides scant

19   factual basis for these claims.   *Answer*, p. 25.   To his reply, Beck attached statements

20   that he contends provide evidence to establish that Craig "was motivated to harm"

21   Nickell, and that Beck was not.   *Reply,* pp. 30-31.   However, examination of the

22

1    testimony offered neither undermines the State's motive theory, nor establishes that

2    Craig had a motive other than that alleged.

3         The first statement is a partial transcription of Officer Gamber's interview of

4    Lara Nash.  *Reply*, Ex. CCC-1 (Doc. 25-3).  Nash was familiar with Beck, Craig,

5    Nickell, Morris and Kuiper, was not an eyewitness to any of the events on the

6    evening of Nickell's death.  She did state that Craig had Nickell pawned what she

7    thought to be a stereo and that Craig was unhappy that Nickell had only received

8    $10.00.  *Id*., Ex. CCC-1, p. 3.  After Craig got angry with Nickell about the stereo,

9    Nickell threw $40.00 at him.  *Id.*

10        John Mitchell, who was at the apartment with Morris and Kuiper when Beck

11   and Craig returned the night of the murder, gave a statement to Deputy Egurrola of

12   the Pima County Sheriff's Department.  *Reply*, Ex. DDD (Doc. No. 25-5).  Beck

13   claims that Mitchell confirmed that Craig and Nickell fought a few days before and

14   also contradicted Morris's statement that Beck and Craig went into the bathroom

15   when they returned to the apartment sometime before midnight the night of the

16   killing.  *Reply*, p. 31.  However, Mitchell only described an argument between Craig

17   and Nickell, but did not know why the two were arguing.  *Reply*, Ex. DDD, pp. 7-8.

18   Mitchell's statement is also consistent with Morris's recollection that both Beck and

19   Craig went to the bathroom when they returned to the apartment.  *Id*.

20        Jacob Workman, who identified himself as Beck's best friend, was also

21   interviewed.  *Reply*, Ex. AAA (Doc. 25-1).  He was not in town when the murder

22   happened, but he believed that Beck would not have killed Nickell. He did confirm

1    that the others who had been at the apartment told him consistent stories about what

2    had occurred.  *Id.*, Ex. AAA, pp. 7-10.

3        Jessica Costello was interviewed and Beck contends she heard Kuiper and

4    Morris assert that Craig was responsible for the homicide and that she contradicted

5    the story about the two going to the bathroom.  *Reply*, p. 31.   However, Costello

6    stated that she thought Beck helped Craig kill Nickell.  *Reply*, Ex. BBB (Doc. 25-2),

7    p. 33-34.

8        Even considering these statements collectively, they do little to contradict the

9    State's motive theory.   Assuming that any of the statements other than Mitchell's

10   would not have been inadmissible hearsay, they offer very little that would have had

11   little impact on the existing evidence.  As Kuiper testified, Craig told him that he and

12   Beck were looking for Nickell.  Thus, the jury was aware that Craig had a motive to

13   find Nickell.   That Beck also had a motive was confirmed by Beck's inquiry to

14   Officer Gamber "as to what would happen to a person in a hypothetical situation who

15   wanted someone to be beaten up and the second party of the assault killed the person

16   who was scared."  *Answer*, Ex. V, 136-137.  As such, Beck cannot show that his trial

17   counsel was ineffective for not procuring this testimony or that he was prejudiced

18   because it was not presented.  *Strickland*, 466 U.S. at 697; *Harrington v. Richter*, 131

19   S.Ct. 770, 792 (2011) ("The likelihood of a different result must be substantial, not

20   just conceivable.")

21

22

1

### c.     Ground VI

2       In Ground VI, Beck alleges ineffective assistance based on his counsel's

3  failure to adequately challenge the admission of his adoptive admission of Craig's

4  statement that they had killed Nickell, and by failing to present evidence of Beck's

5  character trait for reticence.  Addressing the first part of this claim on direct appeal,

6  the Arizona Court of Appeals noted that trial counsel had filed a motion in limine to

7  preclude the statement on hearsay grounds, but that, "[a]fter a hearing, the trial court

8  found that [Beck] had adopted the statement by failing to deny it and concluded that

9  the statement was not hearsay and was admissible as an admission by a party

10  opponent, pursuant to Rule 801(d)(2) . . . ."  *Answer*, Ex. A, p. 6.  Thus, it is clear in

11  the record that Beck's counsel did challenge the admissibility of the statement.

12       Moreover, rather than finding that Beck adopted the admission by silence, as

13  Beck asserts was the case, the State courts found that he adopted the statement by

14  laughing and nodding his head.  *Id*., Ex. A, p. 7.  This finding is supported by

15  Kuiper's testimony at trial, i*d*., Ex. W, pp. 82, 114-115, and thoroughly undermines

16  not only Beck's contentions that the trial court found he adopted the statement by

17  silence, but also his contention that evidence of his reticence would have helped his

18  case.  Reticence may have provided an explanation for silence in response to the

19  statement, but as the trial court determined, "would have been of very little value"

20  and "would have in all likelihood backfired" in light of the fact that the statement

21  was actively adopted with a manifestation of approval.  Beck was neither the

22  recipient of ineffective assistance nor subjected to prejudice due to his counsel's

1    actions in relation to his adoption of Craig's statement about killing Nickell.

2    Accordingly, the State court's determination was not an unreasonable application of

3    the *Strickland* standards.

### d.    Ground VII

5    In Ground VII, Beck alleges that his counsel was ineffective for not objecting

6    to the prosecution's "burden-shifting." As described in his petition on appeal filed in

7    the State court and in his Reply here, the alleged "burden-shifting" to which he refers

8    occurred in opening statements when the prosecutor purportedly stated that

9    Wimmer's testimony, that Beck had confessed to the murder while in jail, had

10   nothing to do with a beneficial plea agreement he was offered. *Reply*, p. 33; *Answer*,

11   Ex. H, p. 29.

12   What Beck describes in this claim is more akin to "vouching," which is how

13   he describes the prosecutor's statement later in his argument, than to "burden

14   shifting." "Vouching consists of placing the prestige of the government behind a

15   witness through personal assurances of the witness's veracity . . . ." *United States v.*

16   *Witherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005). In analyzing the effects of a

17   prosecutor's vouching, the Court looks to a number of factors, including: "the form of

18   the vouching; the degree of personal opinion asserted; how much the vouching

19   implied that the prosecutor had extra record knowledge of the witness' truthfulness;

20   and the importance of the testimony in the overall context of the case." *United States*

21   *v. Williams*, 989 F.2d 1061, 1072 (9th Cir. 1993) (citations omitted).

22

1    In support of his vouching argument, Beck provides a citation to the trial

2  transcript where the vouching was said to occur.  However, although the prosecutor

3  does discuss Wimmer's testimony on the cited page, he does not on that page or the

4  adjacent pages mention anything about Wimmer's plea agreement.  *See Answer*, Ex.

5  U, p. 58.  As such, the vouching identified by Beck has not been shown to have taken

6  any prejudicial form or to have been substantial in degree.

7    Additionally, on the witness stand at trial, Wimmer testified on direct

8  examination that he was given a favorable plea agreement as a result of his testimony

9  and on cross-examination the benefits he received under the agreement were fully

10  explored.  *Answer,* Ex. V, pp. 31-32, 45-47.  The jurors were also told that the

11  opening statements were not evidence.  *Id.,* Ex. V, pp. 15-16.  As such, the jury was

12  fully aware of the agreement and its parameters, knew that anything the prosecutor

13  said was not evidence, and was therefore able to make its own determination of the

14  plea agreement's impact, or lack of impact, on what Wimmer was saying.

15  Accordingly, Beck cannot show that there was no reasonable basis for the State court

16  to reject his claim that trial counsel was ineffective for failing to object to the

17  prosecutor's purported vouching.  *See Richter*, 131 S.Ct. at 786.

18    **e.    Ground VIII**

19    In Ground VIII, Beck alleges counsel was ineffective for failing to adequately

20  investigate and challenge witness Joshua Wimmer's testimony.  Specifically, Beck

21  asserts that his trial counsel "made no effort" to undermine Wimmer's testimony by

22  challenging the details of his testimony, that he failed to expose Wimmer's lies to

34

1   police regarding the armed robbery charges he was facing, did not call Adam

2   Hartley-Ramsey, Beck's cell-mate, to rebut Wimmer's testimony. *Reply*, pp. 34-35.

3       As a threshold matter, the trial transcript shows that Beck's counsel effectively

4   cross-examined Wimmer.  Wimmer testified that Beck had admitted to tying

5   Nickell's hands and stabbing him, and also testified that he had memorialized the

6   admission with a contemporaneous note. *Answer*, Ex. V, pp. 22, 25.  On cross-

7   examination, Beck's counsel elicited testimony from Wimmer about the armed

8   robbery charges against him, the favorable plea he obtained in exchange for his

9   testimony, that Beck was talking to him about the allegations contained in the police

10  reports and not the actual facts of the case, and that the facts of Beck's purported

11  admission were inconsistent with the crime. *Id*., Ex. V, pp. 34-37.  Trial counsel

12  asked Wimmer if he had told the prosecution that Beck said he tied Nickell's hands

13  by himself.  When Wimmer denied that statement, trial counsel impeached him with

14  the transcript.  *Id*., p. 37.  Trial counsel also impeached Wimmer about

15  inconsistencies about whether Beck had blood on him and whether one or two knives

16  were used.  *Id*., pp. 38-41.  He also emphasized the fact that Wimmer waited

17  approximately a month and a half or two months after Beck's alleged statement to

18  give his note about the statement to his own attorney. *Id.,* p. 42.

19      Despite this examination of Wimmer, Beck nevertheless contends that he

20  should also have been cross-examined about "his clear lies regarding his armed

21  robbery allegations," and about his juvenile record. *Reply*, p. 34.  However, Beck

22  does not identify any of the "clear lies" or what material from the juvenile record

1   should have been used.  In any case, the jury was made thoroughly aware of the

2   armed robbery charges, the potential sentence Wimmer was facing on those charges,

3   the reduction of that potential sentence he received in exchange for his testimony,

4   and the inconsistencies in his statements.

5          In his final argument, Beck contends that his counsel was ineffective for

6   failing to call as a witness Beck's cell-mate, Adam Hartley-Ramsey.  Beck asserts

7   that Hartley-Ramsey would have testified that he never heard Beck admit his

8   responsibility in the homicide.  As Respondents note, during trial, Beck's counsel

9   decided, with Beck's approval, not to call Hartley-Ramsey as a witness because the

10  trial court intended to allow the prosecution to cross-examine Hartley-Ramsey about

11  other issues that would undermine the defense.  *Answer*, Ex. LL, pp. 9-15, 25.

12         Hartley-Ramsey later testified during the evidentiary hearings on Beck's PCR

13  petition.  *Id.*, Ex. BB, pp. 7-49.  Hartley-Ramsey said he and Beck were in the same

14  jail pod and were cell-mates for approximately six months and that Beck had told

15  him on several occasions that he and a friend had taken the victim to the desert and

16  tied him up with the intention to leave him there to frighten him.  He said Beck was

17  surprised when his co-defendant stabbed the victim.  *Id.*, pp. 10-12, 24-25; Ex. DD,

18  pp. 26-27.  Hartley-Ramsey also testified that it was "common knowledge" in the

19  pod at the jail that Beck had kidnapped the victim and the victim "wound up dying."

20  *Id.*, Ex. DD, pp. 28-29.  Hartley-Ramsey also testified that he had not heard Beck

21  discuss his case outside of their cell or with Wimmer, but said there had been

22  opportunities for the two to speak without his knowledge and that he had witnessed

1    Beck speaking through the vent. *Id.*, Ex. BB, pp. 13-16, 30-32; Ex. DD, pp. 22-23.

2    He also stated that Beck's trial counsel spoke to him "two or three times" about

3    appearing as a witness in Beck's defense. *Id.*, Ex. BB, pp. 45-47; Ex. DD, pp. 21-22.

4           Based on this testimony, the trial court issued its ruling on Beck's PCR

5    petition and addressed this claim as follows:

6                  Also called to testify at the [PCR] hearing was petitioner's jail
             cell mate Adam Hartley-Ramsay.  Petitioner argued that he should have
7            been a defense witness to impeach Joshua Wimmer's testimony about
             defendant's jail admissions.  He would have been useful to discredit
8            Wimmer's testimony to a degree.  However, Hartley-Ramsay said he
             would have testified truthfully that petitioner confessed to him that he
9            tied up the victim with the codefendant and took him to the desert
             where the victim was killed.  This would have corroborated Detective
10           Gamber's testimony about petitioner's "hypothetical" admission to
             him.  In addition, Hartley-Ramsay said on examination by the county
11           attorney that it was common knowledge in the jail pod that petitioner
             was involved in the kidnaping but denied the actual killing of the
12           victim.  The county attorney also elicited Hartley-Ramsay's view that it
             was possible witness Wimmer and petitioner did have a conversation.
13           [Beck's counsel] was not ineffective for failing to call Adam Hartley-
             Ramsay.  The evidentiary hearing demonstrated Hartley-Ramsay would
14           have been a devastating witness for the state.

15   *Answer*, Ex. G, p. 3.[1]

16          Based on this record, Beck's counsel's decision, after consultation with Beck,

17   not to call Hartley-Ramsey as a witness did not constitute ineffective assistance of

18   counsel.  After the trial court ruled that issues other than those used to impeach

19   Wimmer would be admitted at trial, Beck's counsel recognized, as the trial court also

20   concluded after the PCR hearing, that the prejudice resulting from the testimony

21   _____

22   [1] Ramsey-Hartley's name is spelled "Ramsey-Hartley" in the record, spelled
     "Ramsay-Hartlay" in the trial court's order.

1    would far outweigh any potential benefit.    As such, Beck's counsel was not

2    ineffective and the State court was not unreasonable in rejecting this claim.

3    *Strickland*, 466 U.S. 668, 687-88; *Pinholster*, 131 S.Ct. at 1403 (where AEDPA

4    applies, federal habeas court's review of state court's denial of ineffective assistance

5    of counsel claim is "doubly deferential") (citations omitted).

6    **III.    RECOMMENDATION**

7        Based on the foregoing, the Magistrate Judge **RECOMMENDS** that the

8    District Court, after its independent review, **deny** Beck's Petition for Writ of Habeas

9    Corpus (Doc. 1).

10        This Recommendation is not an order that is immediately appealable to the

11   Ninth Circuit Court of Appeals.    Any notice of appeal pursuant to Rule 4(a)(1),

12   Federal Rules of Appellate Procedure, should not be filed until entry of the District

13   Court's judgment.

14        However, the parties shall have fourteen (14) days from the date of service of

15   a copy of this recommendation within which to file specific written objections with

16   the District Court.    *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the

17   Federal Rules of Civil Procedure.    Thereafter, the parties have fourteen (14) days

18   within which to file a response to the objections.    If any objections are filed, this

19   action should be designated case number: **CV 11-0090-TUC-RCC**.    Failure to timely

20   file objections to any factual or legal determination of the Magistrate Judge may be

21    . . . .

22    . . . .

considered a waiver of a party's right to *de novo* consideration of the issues. *See*

*United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003)(*en banc*).

Dated this 7th day of August, 2013.

_____
Jacqueline M. Rateau
United States Magistrate Judge